Johns-Manville Corporation of Delaware, Appellant, v. La Tour D'Argent Corporation et al., Defendants. The Palmolive Building Corporation, Appellee.

### Gen. No. 37,373.

Opinion filed November 27, 1934.

PHILIP A. WEINSTEIN, for appellant.

TROWBRIDGE, LOWRIE, O'DONNELL & JOHNSTON, for appellee; PAUL O'DONNELL, of counsel.

MR. JUSTICE SCANLAN delivered the opinion of the court.

A bill to establish a mechanic's lien on the Palmolive Building. Palmolive Building Corporation, owner of the fee in the premises, and La Tour D'Argent Corporation, were made defendants. The last named was defaulted for failure to file an appearance or answer. The special commissioner to whom the cause was referred filed a report finding that complainant was entitled to a mechanic's lien upon the premises in the amount of $1,420, plus interest at the rate of five per cent per annum from November 7, 1929, but that it was not entitled to the overtime claimed in the bill. The chancellor sustained exceptions of Palmolive Building Corporation (hereinafter also called Building Corpo-

ration) to the report, overruled complainant's exceptions to the finding as to overtime, and dismissed the bill for want of equity. Complainant appeals.

The bill alleges that Building Corporation leased certain space in the premises to George J. Annes, on June 11, 1928, for a period of 20 years, for restaurant purposes; that the lease contained a provision that it could be assigned to a corporation to be organized by Annes; that La Tour D'Argent Corporation was so organized and the lease assigned to it, and Building Corporation consented to the assignment; that on November 7, 1929, La Tour D'Argent Corporation, with the knowledge, permission, consent and authority of Building Corporation, entered into a written contract with complainant by the terms of which complainant agreed to install certain material in that part of the premises leased to La Tour D'Argent Corporation for the purpose of absorbing sound and noise in the main kitchen and dishwashing room of the restaurant, and to permanently improve the premises, for the contract price of $1,420; that La Tour D'Argent Corporation requested complainant to do overtime work, which complainant did, by reason whereof it was entitled to recover the sum of $206.86, making a total of $1,626.86, plus interest at five per cent per annum from November 11, 1929, due complainant from La Tour D'Argent Corporation, no part of which has been paid, and that the work, labor and material so furnished constitutes a valuable and permanent improvement to the premises, by reason whereof complainant is entitled to a lien for the said amount due. The bill prays that it be decreed a lien and the premises be ordered sold in the event the amount found due be not paid. Building Corporation, by its answer, admits the execution and assignment of the lease, neither admits nor denies the execution and performance of the contract, but denies that it was entered into for the purpose of permanently improving the

premises, or with its knowledge, permission, consent or authority. Upon the hearing no question was raised as to the performance of the contract by complainant, nor that no part of the amount due was paid, nor that the bill was not filed within the statutory time. Complainant's theory of the case is:

"(a) The labor and materials furnished to the premises in question by complainant were of such nature as to establish a mechanic's lien in favor of the complainant under the statute.

"(b) Palmolive Building Corporation, owner of the fee, authorized or knowingly permitted La Tour D'Argent Corporation to contract for the furnishing of the labor and materials in question, or authorized or knowingly permitted such labor and materials to be furnished."

Building Corporation contends: "(1) The sanacoustical blocks in question, and the nature of their installation, show them to be chattels which never became a permanent part of the real estate, or an improvement of the real estate so as to be the basis for a mechanic's lien under the Statute. (2) The Palmolive Building Corporation neither authorized nor knowingly permitted the contract to be let nor the labor and materials to be furnished."

The contract between complainant and La Tour D'Argent Corporation contained, *inter alia,* the following provisions:

"The work to be done includes the installation complete of a Johns-Manville Sanacoustic Tile Acoustical Treatment on entire ceiling area of the main kitchen and on the entire ceiling area and 4' 0" down from the ceiling on the walls of the dishwashing room, of the Silver Tower Restaurant, located at 917 N. Michigan Avenue, Chicago, Illinois.

"The areas to be treated are as follows:

| | |
|---|---|
| Main Kitchen (ceiling only) | 1018 sq. ft. |
| Dishwashing Room (ceiling and 4'–0" down on walls) | 402 " " |
| Total | 1420 " " |

"*Specifications:*

"1" thick furring strips, spaced 4'–0" on centers, shall be secured with toggle bolts to the plastered ceiling and walls. Special steel tees, for the support of the tile, shall then be securely fastened to the furring strips. The tees shall be spaced 16" on centers and at right angles to the furring strips.

"Johns-Manville Sanacoustic Tile, 16" x 16", finished in standard cream-color, baked enamel and backed by a 1" thick sound absorbing pad of Rock Wool, shall then be attached to the steel tees to cover the entire area to be treated.

"The edges of the treated areas shall be finished with a wood moulding which shall be painted with two coats of an approved interior paint."

The special commissioner found that

"The work (under the contract) consisted of the installation of sound absorbing material on the ceiling and a portion of the wall area in the kitchen and dishwashing rooms of the Silver Tower Restaurant; the trade name for the sound-absorbing material installed was 'Sanacoustic Tile,' and in order to install said material it was necessary for complainant to punch holes in the ceiling and walls by striking a Star drill with a hammer so that the drill was forced clear through the ceiling, lath and plaster; said holes were 20" apart on lines 4' apart. 1" thick wood furring strips were attached and secured to the ceiling and walls by means of toggle bolts inserted and fastened in the holes previously made. Steel 'T'-shaped rails, or runners, were then nailed or fastened to the furring

strips. The Sanacoustic Tile was then fitted into the spaces between these 'T'-shaped rails and the toggle bolts were firmly screwed into the ceiling to hold the tile tightly and firmly in place.''

The commissioner further found that

''In order to remove the acoustical tile (the material installed by the complainant) from the ceiling and walls of the kitchen and dishwashing rooms of the restaurant on the premises of the Palmolive Building, it will be necessary to remove the tile and to remove the furring strips and to pull out the toggle bolts; when the holes are punched in the ceiling and walls for the insertion of the toggle bolts, large pieces of plaster fall; upon removal of the tile and strips and bolts the ceiling and walls would be left with a large number of holes at least $3/4''$ in diameter, with many additional holes in the ceiling and walls where the plaster had fallen; the extent of the damage to the plaster would involve the replastering of the entire ceiling and walls.

''The acoustical tile installed by the complainant is still on the premises of Palmolive Building Corporation; said premises are now occupied by a restaurant operated by Huyler's, Incorporated; the restaurant, kitchen and dishwashing rooms contain said acoustical installation made by complainant.

''The work, labor and material furnished by the complainant constituted a valuable and permanent improvement and enhanced the value of the premises of the Palmolive Building Corporation and benefited said defendant.''

L. R. MacAdam, a salesman for complainant, testified that complainant ''had to put some furring strips on the ceiling which necessitated paneling the ceiling with quarter bolts to put the strips up there so that it would be a permanent improvement to the building''; that he showed Browne, of Ross & Browne, the agents of the building, a sample of the material to be

used, "sanacoustical tile, which had a very high absorption of 82%"; that Browne said "he wanted something good in the building, and had considered other materials which, in his opinion, would disintegrate due to steam and moisture that would be present in these rooms, and he couldn't have such material; that the Johns-Manville treatment was the best of its kind, and he recommended to Annes that he put it in"; that Browne further said that he was glad to see complainant get the job, because every time they made a sale it increased his dividends because complainant bought a lot of clips and hardware from a company in which he was a director, the Paying Products Company; that Browne "told us, 'All right, go ahead, sign it up,' " and thereupon Annes signed the contract between complainant and La Tour D'Argent Corporation for the work in question. Walter F. Hodge, a witness for complainant, testified that "in installing the tile, the men made holes in the ceiling with a Star drill through which to slip the toggle bolts. The drill is forced clear through the ceiling until it strikes the air space above the lath and plaster. Wood furring strips were installed on 4-foot centers with toggle bolts placed along the wood furring about every 20-24 inches with a few intermediate strips to where the exact dimensions of the room did not divide into 4-foot centers. I have been there several times since it was completed. I saw complete installations with the sanacoustical tile in place and whatever molding was necessary to furnish trimming. . . . The hole in the ceiling in which the toggle bolt is inserted is intended to be about three-fourths inch in diameter. A given portion of the plaster always falls away when this drill is driven into the ceiling; large chunks of plaster frequently fall. The sound-proofing material is clasped to the wooden strips. The installation of sound proofing material can be removed by taking off the tiling and taking out the toggle bolts and taking off the

strips. Where the installation is taken off, the ceiling has a number of holes ¾″ in diameter with some plastering out surrounding the hole. There is a hole every 2′ longitudinally and a little over 4′ width-wise, but the extent of the damage to the plaster would involve virtually replastering the entire ceiling.'' For Building Corporation, Aldis J. Browne testified that he told MacAdam that they were interested in having the restaurant a success on account of the tenants *and on account of the building,* that they felt that the tenants should do something to reduce the noise which was coming from the kitchen into the dining room, and that the best way to do it was by the installation of some sound-deadening equipment; that there were several different materials that were used for such a purpose; that he knew the material used by complainant, as it had installed the material in one or two offices in the Morton Building, and he knew that complainant used good material which proved very satisfactory. This witness did not testify as to the installation made in the Palmolive Building, but he stated that he had seen like installations made of the type of sound-proofing material used by complainant and that they were installed in the following manner: ''There is a wooden strip called the furring strip that is attached to the ceiling by the toggle bolt which is put through the clay tile and it is screwed up so the strip is tight against the ceiling. Across that are nailed these T-shaped rails, a steel T-shaped runner, and the sections of the tile are fitted into place between those rails, the pressure of the metal tile block against the rail holding it in place. It is removed by forcing the blocks out, and then the rails are removed by pulling the nails out of the wooden strips. They in turn are taken down by unscrewing the toggle bolts and the toggle bolt is either pushed back up into the tile or cut off and plastered with plaster of paris or some material that will make a smooth surface, and the ceil-

ing is either repainted or recalcimined. The first thing that is done is to make holes in the ceiling at various intervals. Through these holes are slipped the toggle bolts which hold the strips. The bolts that hold the tile in place are attached to the Sanacoustical Tile. When the sound-proofing material is removed it leaves little holes in the ceiling which is the only damage done to the building or to the ceiling by the removal and which can be repaired by filling in the holes and calcimining or painting. The purpose of this Sanacoustic Tile is to reduce the noise."

It appears further from the evidence that the material installed by complainant has not been removed and is now being used by Huyler's, Incorporated, the present tenant of the premises in question and an operator of a restaurant therein. The lease between the Building Corporation and La Tour D'Argent Corporation provides:

"Lessee will make no alterations in, or additions to said premises without first obtaining lessor's written consent, and all erections, additions, fixtures and improvements, whether temporary or permanent in character made in or upon said premises, either by lessee or lessor, shall be lessor's property and shall remain upon said premises at the termination of said lease by lapse of time or otherwise without compensation to lessee, except that lessee may, at the expiration of the lease by lapse of time or otherwise, if not in default, remove all apparatus, fixtures and equipment placed in said premises by lessee, provided that the same can be removed without damage or injury to any of the walls or floors."

Section 1 of the Mechanics' Liens Law, as amended in 1903 (Cahill's Ill. Rev. St., 1933, p. 1766), provides:

"That any person who shall by any contract or contracts, express or implied, or partly expressed or implied, with the owner of a lot or tract of land, or with one whom such owner has authorized or knowingly

permitted to contract for the improvement of, or to improve the same, furnish material, fixtures, apparatus or machinery . . . for the purpose of or in the building, altering, repairing or ornamenting any house or other building, . . . shall be known under this Act as a contractor, and shall have a lien . . .," etc.

Counsel for each side has cited a large number of decisions that it is claimed bear upon the question as to whether or not the complainant is entitled to a mechanic's lien under the statute. While the principles of law that govern claims under section 1 seem clear (see *Sword v. Low,* 122 Ill. 487; *Owings v. Estes,* 256 Ill. 553; *Fehr Construction Co. v. Postl System of Health Building,* 288 Ill. 634; *In re Danville Hotel Co.,* 33 F. (2d) 162, which passes upon section 1 of the Illinois Mechanics' Liens Act), the application of the principles to the facts of a given case is sometimes difficult. From the rulings of the court in *Sword v. Low, supra,* and other cases that follow it, we know that there are many articles such as doors, windows, sashes, mantels, bath tubs, sinks, radiators, grates, electric fixtures, plumbing, water pipes and steam heating apparatus, which by their inherent characteristics as integral parts of a structure appurtenant to land become an integral part of the realty, and cannot be classed as fixtures whether they are, or are not, capable of removal without material injury either to themselves or to the structures to which they are attached or of which they are a part, and that this is so regardless of the intention of the parties. There are other articles which, though originally chattels in their nature, may be so firmly affixed to the realty that they cannot be removed without material injury to the real estate to which they are affixed, and hence cannot be removed as chattels. There is another type of articles affixed to realty which may be separated from the realty without material damage to the real estate and

which are no essential or integral part of the structure.

The Mechanics' Liens Act permits a lien for materials or fixtures. The term ''material'' as used in section 1 embraces the ordinary type of building material which goes into and becomes a component part of the building, such as mortar, cement, sand, brick, lumber, etc. (See Love on Mechanic's Liens, p. 92.) It seems to us that the sound-absorbing material used by complainant and affixed to the ceiling and walls in the manner indicated in this case was material within the provisions of section 1. As argued by complainant, the installation of tile, as in the case at bar, is more permanent in character than papering, painting, calcimining, or other forms of decorating and for which liens are allowed. There is merit in complainant's further argument that ''modern methods of building construction include acoustical, ventilating, cooling, heating and other scientific improvements that become part and parcel of the construction of the building. Churches, auditoriums, theaters, offices, schools, court rooms, restaurants, and other similar places are being scientifically treated with acoustical materials in order to absorb sound and noise, and such treatment in each instance constitutes a part of the materials intended to remain permanently in the building in place of plaster, wood, stucco, or other finishing materials. The acoustical tile involved in this case is a 'material' rather than a 'fixture.' '' The material in the instant case was ordered specially to fit into the kitchen and dishwashing room of the premises, and the method of affixing the tile to the ceiling and walls indicates that it was the intention of the parties that the sound-absorbing material was to become a permanent part of the real estate. The material installed by complainant has not been removed and is now being used by Huyler's, Incorporated, the

present tenant of the premises in question and an operator of a restaurant therein. Under the provisions of the lease that we have heretofore referred to La Tour D'Argent Corporation would not, in our judgment, under the facts in evidence, have had the right to remove the sound-absorbing material from the ceilings and walls of the premises in question without the consent of appellee.

But even if there is a distinction between the sound-absorbing material for which the lien is sought and the "material" contemplated by section 1, nevertheless, the sound-absorbing material must, at least, be considered a part of the real estate within the classification of "fixtures" for which a lien is allowed by section 1. In *Fehr Construction Co. v. Postl System of Health Building, supra,* the Supreme Court held that fixtures are permanent and not merely trade fixtures where they are firmly attached to the realty, are attached to and necessary for the purpose for which the premises are used and leased, and were intended by the parties to the lease to become a part of the realty. Tested by these requisites, we are of the opinion that under the evidence the sound-absorbing material classified, at least, as fixtures for which a lien is allowed by section 1. We conclude that the sound-proofing installation, under the evidence, is either an integral part of the building in question or it is so firmly attached thereto that it cannot be removed without material injury to the structure and to the installation itself.

Appellee argues that its objection to the admission of the contract between complainant and La Tour D'Argent Corporation should have been sustained, upon the ground that there was no proof that the person who signed it as president of La Tour D'Argent Corporation was its president. It would be a sufficient answer to this contention to say that no cross error has been assigned by appellee. However, the record

shows that the specific objection that appellee made at the time of the offer was that there was no proof of the authority of Annes to sign for the corporation, so that the instant point seems to be an afterthought. The acceptance of the assignment was signed, "La Tour D'Argent Corporation, By Geo. J. Annes, President. Peter W. Alexander, Secretary," and attached to it was the seal of the corporation, and the evidence of MacAdams shows that Annes signed the instrument. The evidence further shows that the lease in question was originally made to Annes and that he was given the right to form a corporation and to assign the lease to it. The assignment of the lease from Annes to La Tour D'Argent Corporation was admitted without objection. In fact, appellee, in its answer, admits that it consented to the assignment from Annes to La Tour D'Argent Corporation. The return of the sheriff on the pluries summons issued in the instant case showed service on La Tour D'Argent Corporation "by delivering a copy thereof to Geo. Annes, President of said corporation this 14th day of October, 1931." Appellee offered no evidence that would support its present contention. Moreover, it was not essential, under section 1, that complainant prove that it made a *written* contract with La Tour D'Argent Corporation.

Appellee further contends that "the Palmolive Building Corporation neither authorized nor knowingly permitted the contract to be let nor the labor and materials to be furnished." In support of this contention appellee first contends that the proof fails to show that Ross and Browne had actual knowledge of the execution of the contract and of the furnishing of the labor and material thereunder. This contention, under the facts, is without merit.

Appellee further contends that neither Ross nor Browne, nor the other partners of that firm, were officers, agents or employees of appellee; that "the scope of their agency is the care, management, operation and

renting of the building''; that ''the only persons who could knowingly permit the execution of a contract, or the performance of the work in the premises under the exclusive control of the tenant, so as to create a lien against the building, or the fee in the land, would be the officers of the corporation having general authority, or some agent given this express authority''; that ''even as to contracts for repairs and decorations on the part of the building under the control of the landlord, the agent is restricted to a sum of $500. In other words, if Ross and Browne determine to install sound-proofing material in some part of the building under the landlord's control, nevertheless, they themselves could not contract for such work if it exceeded $500, without the express special authorization from appellee.'' The fact that the contract of appellee with Ross & Browne restricted the latter to making alterations or improvements in the building not in excess of $500 without the written consent of appellee, is not material, as this is not a suit against appellee for labor and material ordered by Ross & Browne. Complainant's claim is predicated upon the theory that appellee ''knowingly permitted'' its lessee to contract for the work done within the meaning of section 1 of the Mechanics' Liens Act. The main office of Ross & Browne was at 320 Palmolive Building, where they had been located since that building was completed in the summer of 1929. Carl E. Olin, an employee of Ross & Browne, testified that as such employee he had been, for three and one-half years, building manager of the Palmolive Building, at 917-919 North Michigan; that he had charge of the collection of rents, *the operation of the building,* and that he was contact man with all of the tenants; that the following appears on the door of the offices of Ross & Browne, ''Office of the Building, Ross & Browne''; that in the building directory in the lobby of the building is the following: ''Ross & Browne Agents of the Building.'' Aldis J.

Browne testified that Olin, as their employee, had charge of the building and handled the management and renting of the same; that Ross & Browne had a written contract with appellee to act "as agents of the building." In the well considered case of *Mutual Construction Co. v. Baker,* 237 Ill. App. 596, the court had before it a similar question to the one involved in the instant contention. It was there held that the owner will be held to have knowingly permitted repairs or alterations contracted for by a tenant to be done where notice or knowledge of such work comes to an agent of the owner and such agent is in general charge of the property, although the agent might not have authority broad enough to permit him to make a contract for the work himself which would be binding on the principal in the absence of specific approval by the latter; that the scope of such agent's authority is such that when notice or knowledge of the work comes to him it becomes his duty to communicate that knowledge to his principal, and that the owner was chargeable with all the knowledge that the agent had. Under the facts of the instant case we hold that the knowledge of Ross & Browne was the knowledge of the appellee. In support of its instant contention appellee seems to argue that there is no evidence that the sanacoustical material is still in the premises, but what effect, if any, such a state of the record would have upon complainant's case, appellee fails to state. However, after Olin had testified that Huyler's restaurant occupied the premises at the time of the trial, the following occurred: "Q. That acoustical tile is still there, is it not? A. I think it is." During the examination of Browne the following occurred: "Q. Mr. Browne, have you ever seen any of this san-accoustic tile removed after it was installed? A. I don't think I have. Q. Have you ever noticed the condition of that ceiling? A. I have never seen it removed. . . . No, I have never seen that material removed." As the appellee, in the pos-

session and control of the premises, offered no evidence tending to prove that the sound-proofing material had been removed, the only reasonable inference from the proof is that it is still there.

Complainant contends that the trial court erred in not allowing it the amount it claimed for overtime. The commissioner found "that the complainant did not introduce sufficient proof to establish the amount of overtime work or the charge therefor for any such work performed by the complainant." After an examination of the evidence bearing upon the instant question we are satisfied that we would not be justified in disturbing this finding of the commissioner.

After a careful consideration of the record we have reached the conclusion that complainant has not only brought itself within the provisions of the statute, but that the equities are all in its favor and that the chancellor erred in not adopting the recommendation of the special commissioner that complainant is entitled, under the statute, to a mechanic's lien in the amount of $1,420 and interest at the rate of five per cent from November 7, 1929.

The decree of the circuit court of Cook county is reversed and the cause is remanded with directions to the chancellor to enter a decree in accordance with this opinion.

*Reversed and remanded with directions.*

GRIDLEY, P. J., and SULLIVAN, J., concur.